USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/13/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
AUDREY ADAMS, as Administrator of
the Estate of Frank L. Sinclair,
Jr.,

                    Plaintiff,         OPINION

     -against-               04 Civ. 4314 (MGC)

VERIZON NEW YORK, INC.,
COMMUNICATIONS WORKERS OF AMERICA,
AFL-CIO, and LOCAL 1101,
COMMUNICATIONS WORKERS OF AMERICA,

                    Defendants.

------------------------------------X

APPEARANCES:

    LAW OFFICES OF STANLEY N. FUTTERMAN
    Attorney for Plaintiffs
    153 E. 87th Street
    New York, New York 10128

    By: Stanley N. Futterman, Esq.


    EDWARDS & ANGELL, LLP
    Attorneys for Defendant Verizon New York, Inc.
    750 Lexington Avenue, 12th Floor
    New York, New York 10022

    By: Scott H. Casher, Esq.


    SEMEL, YOUNG & NORUM
    Attorneys for Defendants Communications Workers of
    America and Local 1101
    275 Seventh Avenue, Suite 2300
    New York, New York 10001

    By: Amy S. Young, Esq.

**Cedarbaum, J.**

Audrey Adams, as administrator of the estate of her son, Frank L. Sinclair, Jr., sues Verizon New York, Inc. ("Verizon") for breach of a collective bargaining agreement ("CBA") by terminating Sinclair without just cause, and for breach of contract by failing to enroll Sinclair in the Earned Income Protection Plan ("EIPP"), an early retirement severance package. Adams sues the Communications Workers of America, AFL-CIO and Local 1101, Communications Workers of America (collectively "the Union") for violating their duty to Sinclair of fair representation in grievance proceedings related to his termination. Defendants move for summary judgment on all claims. For the following reasons, the motions are granted.

BACKGROUND

Unless otherwise noted, the following facts are undisputed.

Verizon employed Sinclair as a field technician beginning in July of 1992. Sinclair began to develop an absentee problem by 1999, when he was absent from work for fifty-nine days. Sinclair was disciplined three times in 2000 for being absent without leave ("AWOL"). In 2001, Verizon implemented an Absence Control Plan ("ACP"), which set out a six-step process for managers to discipline employees for absences: (1) inquire into

2

the absences, (2) investigate them, (3) discuss the issue and warn of potential termination, (4) discuss further and warn of termination, (5) give a final warning, and (6) terminate the employee.

That same year, Sinclair was absent for one hundred seventy-seven days. After a series of absences, he was placed on ACP step 1 on June 19, 2001. Sinclair later missed work from July 2 to November 5, 2001, allegedly due to relapse of a previous injury. Upon Sinclair's return to work, Verizon placed him on ACP step 2, but the Union would later contest this action through grievance proceedings because relapse of an injury is not cause for advancement in the ACP step process. After another string of absences, Sinclair was placed on ACP step 3 on December 24, 2001.

Sinclair's attendance record in 2002 was similarly poor. After working only six days in January, Sinclair met with his manager Joseph Longobardi and was placed on ACP step 4 on February 5, 2002. Despite a number of absences after this date, Sinclair was not moved to ACP step 5 until June 7, 2002. After yet another series of absences, Sinclair met with Longobardi on September 11, 2002. He requested, and was granted, a two-week leave of absence. Sinclair was AWOL on October 4, 2002. When he came to work on October 7, he was told by his manager Gerald Smith that because of his unapproved absence on October 4, he

"was going to be suspended for 10 days pending dismissal." Smith further testified at his deposition that Sinclair responded as follows: "He said, [']I'm leaving.['] ... I asked him why and he said, [']you are going to fire me anyway, there is no point in me going to get a steward, I'm leaving.['] And he walked out." Sinclair then left the company premises and did not return. His next contact with Verizon and the Union was on October 23, 2002, sixteen days after he walked out.

Verizon sent a letter to Sinclair on October 8, 2002 warning him that if he did not return to work or provide medical documentation to justify his absence, he could be separated from the payroll. Another letter was sent on October 16, 2002 informing Sinclair that he had yet to show up for work or justify his absence, and that if he did not do so by October 25, 2002, he would be removed from the payroll. Adams disputes that the letters were received by Sinclair. She notes that no address is indicated on the letters and that Verizon has not shown where or how the letters were sent. However, Smith testified that the letters were sent to the address Verizon had on file for Sinclair.

Beginning in October of 2002, Verizon offered certain employees the option of leaving Verizon in exchange for certain benefits available in the EIPP. The original deadline to enroll in the EIPP was 11:59 p.m. on October 23, 2002. One condition

of enrollment in the EIPP was that the applicant remain on Verizon's payroll through November 2, 2002. On October 23, 2002, Adams, who is also a Verizon employee, drove Sinclair to meet with Smith in order to have Sinclair enroll in the EIPP. At the meeting Sinclair did not speak with Smith about his employment status; rather, he handed Smith his EIPP forms and sought his approval signature. Smith reviewed the documents but returned them to Sinclair, telling him that they were incomplete and giving him a number to call if he needed further information. Sinclair brought the forms to Adams, who later faxed the forms to Smith. Smith then signed the forms. The parties dispute the exact date that Adams faxed the forms to Smith. Verizon contends that the forms were faxed on October 24, as indicated on the fax timestamp. Adams testified that she faxed them on October 23. Smith's approval signature is also dated October 23.

Regardless of when the forms were faxed, it is undisputed that Sinclair did not check the box indicating that he either accepted or declined enrollment in the EIPP. Sinclair was officially terminated and separated from Verizon's payroll on October 25, 2002. His turnaround document notes that he was "dismissed for job abandonment." His exit interview form lists "Poor Attendance. Job Abandonment" as the reasons for his termination, and further specifies that "Frank walked off the

5

job on 10/7/02 and did not return." On October 29, 2002, Verizon sent Sinclair a third letter indicating that because he did not report to work or provide evidence justifying his absence, he was separated from the payroll effective October 25. Adams again contends that there is no evidence as to whether Sinclair received the letter and where or how the letter was sent.

As mentioned above, the Union initiated a grievance on Sinclair's behalf because Verizon advanced him to ACP step 2 when perhaps it should not have. The initial hearings were held for this grievance on October 4, 15, and 22. The grievance was denied at this initial level on October 22, 2002, and the Union appealed that denial. At the next grievance level, the ACP step grievance was combined with a separate grievance for unfair dismissal. This unfair dismissal grievance was initiated after the Union received a letter from Sinclair's lawyer on April 14, 2003, requesting that the Union take action. Both grievances were denied on May 2, 2003. The ACP step grievance was denied at the final appeal level on December 11, 2003, and the unfair dismissal grievance was denied at the final level on February 13, 2004 because Verizon considered Sinclair's dismissal for job abandonment proper. The Union declined to take either grievance to arbitration because it concluded that, given Sinclair's

6

unexcused absence record and the fact that he walked out on his job, he would not prevail at arbitration.

Since January of 2001, Verizon had in place an administrative process called the Summary Plan Description ("SPD") through which claims for benefits could be made. Neither Sinclair nor Adams made any claim or appeal for benefits through the SPD.

Sinclair died on June 19, 2003. Adams, his mother, brought this suit as administrator of his estate. Verizon moves for summary judgment, arguing that Sinclair was properly removed from the payroll for job abandonment and that, *inter alia*, he was not eligible for and did not properly enroll in the EIPP. The Union moves for summary judgment, arguing that it fairly represented Sinclair in his grievance proceedings.

## DISCUSSION

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). In deciding whether a genuine issue of fact exists, the court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Summary judgment is appropriate when "the nonmoving party [fails] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Adams's claims against Verizon for breach of the CBA pursuant to § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), and against the Union for violating its duty of fair representation constitute "a hybrid § 301/fair representation claim." DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 165 (1983). To prevail on either claim, Adams must show both "that the employer's action violated the terms of the collective-bargaining agreement and that the union breached its duty of fair representation." Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 564 (1990); DelCostello, 462 U.S. at 165; Sanozky v. Int'l Ass'n of Machinists & Aero. Workers, 415 F.3d 279, 282 (2d Cir. 2005). Adams cannot show either.

I. Breach of the CBA

Verizon's stated reason for dismissing and removing Sinclair from its payroll was that he abandoned his job. Adams contends that Verizon actually terminated Sinclair because of his absences, and that rather than follow the ACP step process, it removed him from the payroll in October in order to avoid having him enroll in the EIPP.

It is undisputed that, as recorded on Sinclair's October 7, 2002 absence report, when Sinclair came to work that day, Smith informed him "to get a union steward," and that, "because of his unapproved AWOL absence on 10/4/02[,] he would be suspended for 10 days pending dismissal." It is undisputed that Sinclair responded to this by saying "I'm leaving ... you are going to fire me anyway, there is no point in me going to get a steward, I'm leaving." It is undisputed that Sinclair left the premises and did not return in any capacity until October 23, 2002, when he sought to enroll in the EIPP. It is also undisputed that Verizon's turnaround document says that he was "dismissed for job abandonment," and that his exit interview form lists "Poor Attendance. Job Abandonment" and "Frank walked off the job on 10/7/02 and did not return" as the reason for removing him from the payroll.

9

Job abandonment is just cause for removing Sinclair from the payroll. See, e.g., Brown v. The Pension Bds., United Church of Christ, 488 F. Supp. 2d 395, 403, 406, 410 (S.D.N.Y. 2007) (holding that job abandonment was a legitimate, non-discriminatory, non-retaliatory cause for termination after plaintiff was AWOL for two days in a row and failed to call to justify the absence); Perkins v. Memorial Sloane-Kettering Cancer Center, No. 02 Civ. 6493 (RJH), 2005 WL 2453078, *19 (S.D.N.Y. 2005) ("an employer is entitled to terminate an employee perceived to be engaging in insubordinate behavior or job abandonment"); Forde v. IBM Corp., No. 00 Civ. 6888 (JSR), 2003 WL 740220, *4 (S.D.N.Y. 2003) (holding that job abandonment was a legitimate, non-discriminatory reason "well within [defendant's] business prerogative" where plaintiff was AWOL for over a week). Abandoning one's job is the equivalent of resigning from a job; it is not an action taken by the employer, but one taken by the employee. Verizon interpreted Sinclair's statement, "I'm leaving ... you are going to fire me anyway, there is no point in me going to get a steward, I'm leaving," as meaning that he was resigning or abandoning his job. Sinclair was AWOL for sixteen days, and when he did return, it was to submit EIPP forms, not to reclaim his job or provide evidence to justify his absence. It was reasonable for Verizon to interpret Sinclair's actions as constituting abandonment of his job.

Adams proffers no evidence to support her assertion that Verizon chose job abandonment as a way to avoid proceeding along the ACP step process.

II. Duty of Fair Representation

"A union breaches its duty of fair representation if its actions ... [are] wholly 'arbitrary, discriminatory, or in bad faith.'" Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998) (quoting Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991)). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness ... as to be irrational." O'Neill, 499 U.S. at 67 (citation and quotation marks omitted). "A union acts in bad faith when it acts with an improper intent, purpose, or motive. ... Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." Spellacy, 156 F.3d at 126 (citation omitted). There must also be a "causal connection between the union's wrongful conduct and [plaintiff's] injuries." Id. (citations omitted).

"Included in the union's duty of fair representation is the fair and prompt consideration and, if dictated by controlling legal standards, processing on behalf of employees of their

claims under contract dispute resolution procedures, ... although the duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." Cruz v. Local Union No. 3 of the IBEW, 34 F.3d 1148, 1153-54 (2d Cir. 1994) (citations and quotation marks omitted). "[T]he union typically has broad discretion in its decision whether and how to pursue an employee's grievance against an employer." Terry, 494 U.S. at 567-68. "Judicial review of union action ... 'must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities.'" Spellacy, 156 F.3d at 126 (quoting Gvozdenovic v. United Air Lines, Inc., 933 F.2d 1100, 1106 (2d Cir. 1991) (internal citation omitted) (brackets in Spellacy)).

Adams argues that the Union's representation of Sinclair was perfunctory and that its prosecution of the grievances was belated and only proceeded after receipt of a letter from Sinclair's attorney. She also contends that the Union did not seek assistance from Sinclair or his representatives, that the Union in effect abandoned his ACP step grievance on the ground that it was "mutually resolved" because Sinclair "left the company payroll," and that, in abandoning his ACP step grievance, the Union doomed his chances of succeeding on the
12

unfair dismissal grievance. She further notes that the Union did not mention Sinclair's attempted enrollment in the EIPP and Verizon's failure to notify the Union that it was terminating Sinclair as required under the CBA. Finally, Adams criticizes the Union for refusing to bring Sinclair's claims to arbitration.

These arguments are meritless. The Union's actions were neither arbitrary, discriminatory, nor in bad faith. Given Sinclair's long record of absences and his inability to provide legitimate reasons for such absences, the Union's actions cannot be deemed irrational. On the contrary, its decisions were well within its discretion in deciding how to proceed with his claims. Moreover, Adams has proffered no evidence that the Union acted dishonestly, fraudulently, or in bad faith. Since Verizon's position was that Sinclair had abandoned his job, the ACP step grievance and the issue of notice to the Union were irrelevant. Sinclair was not terminated for his absences; he was taken off the payroll because Verizon reasonably thought he had quit his job.

Nonetheless, the Union eventually took the grievances all the way to their final appeal level and lost. Because the Union was still able to prosecute the grievances to the final level, the timing of the Union's actions did not affect the outcome of the proceedings. Thus, there is no "causal connection" between

the Union's alleged untimeliness and Adams's alleged injuries. Spellacy, 156 F.3d at 126. In addition, there is no reason to assume that having the ACP step grievance deemed "mutually resolved" undercut Sinclair's unfair dismissal claim since both claims were independent of each other. Nor is there any reason that mentioning the EIPP issue would have helped, as it is not directly related to the ACP step or unfair dismissal claims. Finally, the Union was well within its discretion not to take Sinclair's grievances to arbitration because of the weakness of his claims. There is no "absolute right" to have a grievance taken to arbitration, nor does a union "breach its duty of fair representation ... merely because it settled the grievance short of arbitration." Vaca v. Sipes, 386 U.S. 171, 191, 192 (1967).

Adams's claim against the Union for violating its duty of fair representation fails because, based on the undisputed facts, the Union's actions were not arbitrary, discriminatory, or in bad faith.

III. Breach of the EIPP Contract

Adams also sues Verizon for breach of contract on the ground that Verizon had offered and Sinclair had accepted the EIPP. This claim fails because Sinclair was not eligible to participate in the EIPP. It is undisputed that the terms of the

EIPP specify that, as a condition of the EIPP offer, the applicant must be employed by Verizon as of November 2, 2002. Verizon properly removed Sinclair from its payroll on October 25, 2002 for job abandonment. Sinclair did not meet the enrollment criteria; thus, he was not eligible for the EIPP.

Defendants also argue that this claim is preempted by ERISA. However, since Sinclair was not even employed by Verizon on the date specified in the EIPP offer, it is unnecessary to reach this issue.

CONCLUSION

Based on the undisputed facts, Verizon properly removed Sinclair from its payroll on October 25, 2002 because Sinclair had abandoned his job. The Union represented Sinclair fairly in his grievance proceedings and acted within its discretion in declining to bring his claims to arbitration. Adams's hybrid § 301/fair representation claim fails as a matter of law. As to the EIPP claim, Sinclair was not eligible to participate in the plan since he had been properly terminated prior to November 2,

2002. For the forgoing reasons, defendants' motions for summary judgment dismissing the complaint are granted.

SO ORDERED.

Dated:   New York, New York
         May 13, 2008

S/
_____
MIRIAM GOLDMAN CEDARBAUM
United States District Judge